# United States Court of Appeals for the Federal Circuit

---

**PEER BEARING COMPANY - CHANGSHAN,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant,*

AND

**THE TIMKEN COMPANY,**
*Defendant-Appellant.*

---

2014-1001

---

Appeal from the United States Court of International Trade in No. 09-CV-0052, Chief Judge Timothy C. Stanceu.

---

Decided: September 12, 2014

---

STEPHANIE MANAKER BELL, Stewart and Stewart of Washington, DC, argued for defendant-appellant. With her on the brief were TERENCE P. STEWART and WILLIAM A. FENNELL.

DIANA DIMITRIUC QUAIA, Arent Fox LLP, of Washington, DC, argued for plaintiff-appellee. With her on the brief was JOHN M. GURLEY.

———————————

Before NEWMAN, PLAGER, and MOORE, *Circuit Judges*.

MOORE, *Circuit Judge*.

The Timken Company (Timken) appeals from the judgment of the United States Court of International Trade affirming the United States Department of Commerce's (Commerce) calculation of an antidumping duty margin for Peer Bearing Company - Changshan's (CPZ) imports. For the reasons below, we *vacate* and *remand*.

BACKGROUND

This case involves Commerce's administrative review of CPZ's entry of tapered roller bearings that were subject to an Antidumping Duty Order. CPZ imported the bearings by selling them to an unaffiliated U.S. importer. The U.S. importer then sold the bearings to CPZ's U.S. affiliate, Peer Bearing Co. (Peer), which then resold them to unaffiliated U.S. customers.

After instituting review, Commerce issued an initial questionnaire requiring CPZ to identify whether its sales of bearings qualified either as export price (EP) sales or as constructed export price (CEP) sales. This classification determines which price Commerce uses as the U.S. price when calculating CPZ's antidumping duty margin for the bearings. If CPZ's sales are properly classified as EP sales, Commerce uses data reflecting the price of CPZ's sales to its unaffiliated U.S. importer, i.e., the EP data. If CPZ's sales are properly classified as CEP sales, Commerce uses data reflecting the price of Peer's sales to its U.S. customers, i.e., the CEP data. CPZ responded that its sales were properly classified as CEP sales and provid-

ed Commerce with the CEP data for its bearing sales. It did not provide the corresponding EP data.

Timken, an intervening domestic bearing producer, submitted comments to Commerce, urging Commerce to require CPZ to also provide the EP data so that Commerce could calculate CPZ's margin on an EP basis. Commerce did not require CPZ to submit the EP data at that time. Instead, in its Preliminary Results, Commerce calculated CPZ's margin on a CEP basis, using the CEP data that CPZ provided. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 41033 (Dep't of Commerce July 17, 2008) (*Preliminary Results*). After Commerce issued the *Preliminary Results*, Timken again submitted comments arguing that the margin should be calculated on an EP basis.

In its Final Results, Commerce changed course and calculated CPZ's margin on an EP basis. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 3987, 3988 (Dep't of Commerce Jan. 22, 2009) (*Final Results*). However, because CPZ had previously provided Commerce with only CEP data, the record contained only limited EP data relating to a small subset of the imported bearings. Commerce used this limited data to estimate the EP prices for each imported product. J.A. 2181. Based on its estimated EP prices, Commerce calculated a margin of 92.84%. *Final Results*, 74 Fed. Reg. at 3989. The Court of International Trade held that Commerce's methods for estimating EP prices in the *Final Results* were contrary to law and remanded. *Peer Bearing Co. - Changshan v. United States*, 752 F. Supp. 2d 1353, 1360–64 (Ct. Int'l Trade 2011) (*Peer I*).

On remand, Commerce reopened the record and twice requested that CPZ provide it with the EP data. CPZ responded that it could not provide the EP data because during the time between Commerce's *Preliminary Results* and *Final Results*, CPZ had been sold and the new owners had not maintained the EP data.[1] In its first redetermination on remand, Commerce held that CPZ had a duty to maintain access to the EP data during the course of the entire proceeding. Final Results of Redetermination Pursuant to Court Remand at 19–20, *Peer Bearing Co. - Changshan v. United States*, No. 09-cv-00052 (Ct. Int'l Trade July 1, 2011), ECF No. 98 (*First Remand Redetermination*). It found that "the issue of [whether EP data or CEP data should be used for] the antidumping duty margin calculation was raised on the record of the underlying administrative review prior to the briefing stage, and again at the briefing stage, before the transfer occurred," and continued to be an issue throughout the proceeding. *Id.* at 19. Thus, Commerce concluded, "CPZ should have been aware that at some point [Commerce] might seek this information," and it had a duty to maintain access to it. *Id.* Commerce determined that CPZ's failure to maintain the EP data constituted a "fail[ure] to cooperate to the best of its ability" within the meaning of 19 U.S.C. § 1677e(b), and therefore applied adverse facts available against CPZ to determine the margin. *Id.* at 20–21. It then calculated a 60.95% margin for CPZ. *Id.* at 22.

The Court of International Trade determined that Commerce erred in applying adverse facts available based on CPZ's failure to maintain access to the EP data. *Peer*

---

[1]    As part of the sale, a new entity established by the previous owners assumed responsibility for the antidumping proceedings at issue here.

*Bearing Co. - Changshan v. United States*, 853 F. Supp. 2d 1365, 1373 (Ct. Int'l Trade 2012) (*Peer II*). It held that 19 U.S.C. § 1677e(b), which allows for the application of adverse facts available if a party fails to act "to the best of its ability to comply with a request for information," does not apply to requests that the party has yet to receive. *Id.* at 1374. It thus found it unreasonable for Commerce to expect CPZ to have preserved the EP data that was requested by Commerce for the first time on remand. *Id.* at 1374–75. The Court of International Trade remanded again for Commerce to "redetermine the U.S. prices of the subject merchandise according to a lawful method." *Id.* at 1378–79.

On the second remand, Commerce again concluded that CPZ's margin should properly be calculated on an EP basis, but that the record did not contain sufficient data for doing so. Final Results of Redetermination Pursuant to Court Remand at 10, *Peer Bearing Co. - Changshan v. United States*, No. 09-cv-00052 (Ct. Int'l Trade Oct. 2, 2012), ECF No. 124 (*Second Remand Redetermination*). Therefore, under protest, Commerce calculated a 6.52% margin using the CEP data, without applying adverse facts available. *Id.* at 10–11. The Court of International Trade affirmed Commerce's *Second Remand Redetermination*. *Peer Bearing Co. - Changshan v. United States*, No. 09-cv-00052, 2013 WL 4615134 (Ct. Int'l Trade Aug. 30, 2013) (*Peer III*).

Timken appeals. It argues that the Court of International Trade should have affirmed Commerce's application of adverse facts available in its *First Remand Redetermination*. It does not challenge the Court of International Trade's review of Commerce's *Final Results* or of its *Second Remand Redetermination*. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

DISCUSSION

We review a decision of the Court of International Trade evaluating an antidumping determination by Commerce by reapplying the statutory standard of review that the Court of International Trade applied in reviewing the administrative record. *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002). We will uphold Commerce's determination unless it is unsupported by substantial evidence on the record or otherwise not in accordance with the law. *Id.*

Commerce may "use an inference that is adverse to the interests of [a] party" (i.e., apply adverse facts available against the party) when it determines that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). In its *First Remand Redetermination*, Commerce held that § 1677e(b) permitted application of adverse facts available for CPZ's failure to retain information even though that information was not requested by Commerce until a remand from the Court of International Trade required it. *First Remand Redetermination* at 19–20. The Court of International Trade held that this interpretation was incorrect. *Peer II* at 1374. We do not agree.

We have previously considered § 1677e(b)'s "best of its ability" provision. In *Nippon Steel Corp. v. United States,* we held that the "best of its ability" provision "requires that importers . . . take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce." 337 F.3d 1373, 1382 (Fed. Cir. 2003). In *Ta Chen,* we clarified that the information an importer must maintain can include information requested for the first time on remand. 298 F.3d at 1333–34; *see also id.* at 1343 (Gajarsa, J., dissenting) ("This statement implies that Commerce's supplemental ques-

tionnaire requested [the CEP] data. That implication is clearly erroneous. The supplemental questionnaire made no such request."); *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, No. 97-08-01344, 1999 WL 1001194, at *12 (Ct. Int'l Trade Oct. 28, 1999) ("Ta Chen did not provide [CEP data]. [Commerce], however, never specifically requested this information."). In *Ta Chen*, after Commerce's Final Results, the Court of International Trade remanded to obtain previously unrequested CEP data when the respondent had only previously provided EP data. *Ta Chen*, 298 F.3d at 1333–34. On remand, the respondent explained that it was unable to provide the CEP data because its affiliate, which originally possessed the data, had gone out of business and no longer had the data. *Id.* at 1334. We affirmed Commerce's application of adverse facts available finding that it was reasonable to expect the respondent to preserve its CEP data in the event that Commerce eventually requested it. *Id.* at 1336. We see no error in Commerce's interpretation or application of § 1677e(b) in this case, which are consistent with *Ta Chen* and *Nippon Steel*. To comply with "the best of its ability" provision, an importer must maintain access to information so long as that information is the type that a reasonable and responsible importer would have known was required to be maintained. The obligation to maintain its data does not cease at the conclusion of the review, when as in this case, there is an appeal which could cause a need for further proceedings.

We conclude that there is substantial evidence to support Commerce's determination that CPZ did not act to the best of its ability to comply with Commerce's request, even though that request came for the first time on remand. Commerce determined that CPZ should have been aware that Commerce may request the EP data and that CPZ had a responsibility to maintain access to it throughout the course of the proceeding. *First Remand Redetermination* at 19. The Court of International Trade

disagreed, holding that "it is not reasonable for Commerce to expect CPZ to have preserved [the EP] data for so long," and that CPZ's failure to do so did not constitute a failure to cooperate. *Peer II* at 1371–75.

We hold that substantial record evidence supports Commerce's finding that CPZ failed to cooperate to the best of its ability by not maintaining access to the EP data throughout the course of the proceeding. The EP data in this case is the type of data that a "reasonable importer should anticipate being called upon to produce." *Nippon Steel*, 337 F.3d at 1382. In each administrative review, Commerce calculates the U.S. price using either EP or CEP data. Commerce's regulations state that it obtains most of its factual information from the interested parties, 19 C.F.R. § 351.301(a), and that Commerce "may request any person to submit factual information at any time during a proceeding," *id.* § 351.301(c)(2). In this case, CPZ was on notice that its EP data may be necessary; Timken twice argued that EP data and not CEP data should be used to calculate the U.S. price. Commerce has established that a reasonable importer would have been on notice that EP data was relevant to the proceeding and may be requested by Commerce. It is true that Commerce initially calculated the U.S. price using the CEP methodology and that, at that time, Commerce had not yet requested the EP data. However, CPZ knew from Timken's repeated objections that the proper calculation of U.S. price was at issue. When Timken was objecting, CPZ had access to the EP data but chose not to provide it or maintain it. Thus, we conclude that under these circumstances, where the importer knew there was a dispute over whether to use EP or CEP data, a reasonable importer would know that it needed to maintain both.

We are not persuaded by CPZ's argument that the sale of the company prevented it from acquiring access to the EP data. CPZ knew before the sale that there was an ongoing dispute over whether Commerce should use CEP

or EP data. And just over four months after CPZ was sold to its new owners, Commerce issued its *Final Results* which calculated the margin on an EP basis. CPZ thus knew unequivocally that Commerce intended to use EP data, but it did nothing at that time to retrieve or preserve it.

CPZ contends that it took reasonable measures to maintain its access to the EP data after the change of ownership because the purchase agreement gave it access to the data. Appellee's Br. at 38. This is inaccurate. The purchase agreement between CPZ and the new owners does not demonstrate that CPZ acted to the best of its ability to maintain access to the EP data. The agreement only required the new owners to give CPZ access to the records in existence—it did not require the new owners to maintain those records. Ensuring access to records without also ensuring that those records continue to exist does not ensure much of anything.

The issue before us is not whether an importer must maintain access to all sales records from the start of an administrative review until the end. We hold that where, as here, there is a dispute over the proper methodology that Commerce should use to calculate the antidumping duty margin, and the respondent has notice of the dispute at a time when the respondent has access to the data needed to determine the U.S. price according to either methodology, the respondent has a duty to maintain access to the data. Failure to maintain access to the data may, based on the specific facts of the case, result in a determination that the importer has failed to act to the best of its ability in responding to a request for the data and an application of adverse facts available against the importer.

## CONCLUSION

Because Commerce's application of adverse facts available in its *First Remand Redetermination* was sup-

ported by substantial evidence, we *vacate* the Court of International Trade's decision in *Peer III* and *remand*. On remand, the Court of International Trade should reinstate Commerce's application of adverse facts available and its calculation of CPZ's margin in its *First Remand Redetermination*.

**VACATED AND REMANDED**