337 F.3d 1373
 NIPPON STEEL CORPORATION, Plaintiff-Appellee,
v.
UNITED STATES, Defendant-Appellant,
v.
Bethlehem Steel Corporation and U.S. Steel Group (a Unit of USX Corporation), Defendants-Appellants, and
ISPAT Inland Inc., LTV Steel Company, Inc., Gallatin Steel, Ipsco Steel, Inc., Steel Dynamics, Inc., and Weirton Steel Corporation, Defendants.
 No. 02-1266.
 No. 02-1267.
 United States Court of Appeals, Federal Circuit.
 August 8, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED J. Christopher Wood, Gibson, Dunn & Crutcher, LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief were Daniel J. Plaine and Gracia M. Berg.
 Kyle E. Chadwick, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant United States. With him on the brief were David M. Cohen, Director; and Lucius B. Lau, Assistant Director. Of counsel on the brief were John D. McInerney, Chief Counsel; Elizabeth C. Seastrum, Senior Counsel; and Linda S. Chang, Senior Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.
 Jeffrey D. Gerrish, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for defendants-appellants Bethlehem Steel Corporation, et al. With him on the brief were Robert E. Lighthizer, John J. Mangan, and Ellen Schneider. Of counsel were James C. Hecht and Daniel L. Schneiderman, Skadden, Arps, et al.
 Before LOURIE, GAJARSA and LINN, Circuit Judges.
 LINN, Circuit Judge.
 
 
 1
 A group of domestic steel producers ("petitioners"), including appellants Bethlehem Steel and U.S. Steel Group (collectively, "Bethlehem"), petitioned the Department of Commerce ("Commerce") to initiate an antidumping investigation of hot-rolled flat-rolled carbon-quality steel products ("hot-rolled steel") from Japan. The United States and Bethlehem separately appeal from a final judgment entered by the United States Court of International Trade, in which the court (1) rejected Commerce's application of partial adverse facts available; (2) invalidated 19 C.F.R. § 351.104(a); (3) ordered the use of a particular weight conversion factor; and (4) affirmed Commerce's starting price for the hot-rolled steel sales at issue. Because Commerce's decision to apply partial adverse facts available to the theoretical weight sales is supported by substantial evidence and is otherwise in accordance with law, we reverse the Court of International Trade's judgment to the contrary. Because Commerce's methodology of calculating the starting price was not in accordance with law, we reverse the Court of International Trade's affirmance of that issue.
 
 BACKGROUND
 
 2
 The underlying facts in this case are largely undisputed and are taken from the Court of International Trade's decisions. See Nippon Steel Corp. v. United States, 118 F.Supp.2d 1366, 1369-72 (Ct. Int'l Trade 2000) ("Nippon I"). On September 30, 1998, petitioners filed a petition with Commerce pursuant to section 732(b) of the Tariff Act of 1930, 19 U.S.C. § 1671a(b) (2000), alleging that hot-rolled steel from Japan and other countries was being dumped in the United States, injuring a domestic industry. On October 22, 1998, in response to the information presented in the petition, Commerce published its notice of initiation of the antidumping investigation underlying this litigation. Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, Japan, and the Russian Federation, 63 Fed. Reg. 56,607 (Dep't Commerce Oct. 22, 1998) ("Initiation of Antidumping Invest.").
 
 
 3
 Commerce issued antidumping questionnaires to six Japanese steel producers identified in the petition. Because Commerce could not examine all six, it selected plaintiff-appellee Nippon Steel Corporation ("NSC") and two other producers as respondents and advised the remaining companies that they need not respond. See Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed.Reg. 8291, 8292 (Dep't Commerce Feb. 19, 1999) ("Preliminary Results").
 
 
 4
 From November 16, 1998, through January 25, 1999, Commerce received responses to initial and supplemental questionnaires. Questionnaire section B requested, among other things, figures that Commerce could use to convert sales made at actual and theoretical weights, respectively, to a common basis ("conversion factor data"). NSC, in a response dated December 21, 1998, did not provide that data, asserting instead that Commerce did not need a "uniform quantity of measure" because "all NSC quantity types are consistent within the product type." In its January 25, 1999 response to a supplemental request, NSC stated that steel sheet sold at theoretical weight (i.e., estimated weight, based upon dimensions) "are never actually weighed" and, thus, NSC had "no way of calculating the requested theoretical-to-actual weight conversion factor." NSC later admitted that, contrary to its initial and supplemental responses, "the actual weight can be calculated."
 
 
 5
 NSC timely reported its gross unit prices for U.S. sales in dollars. It also reported net prices in yen for each sale, which NSC and its customers derived by discounting the invoiced dollar amount by the standard discount rate, then converting to yen at the exchange rate applicable on the ninth day after shipment. NSC's invoices reflect both the gross dollar price and the net yen price. Commerce verified that NSC received payments in yen, and that NSC internally recorded the accounts receivable in yen.
 
 
 6
 On February 19, 1999, Commerce published its preliminary dumping determination. Preliminary Results, 64 Fed.Reg. at 8291. Among other findings, Commerce preliminarily assigned an adverse (highest calculated) margin to sales made by NSC upon a theoretical weight basis because "NSC did not provide conversion factors for these U.S. sales upon [Commerce's] request...." Id. at 8298. Three days later, on February 22, 1999, NSC submitted a theoretical-to-actual weight conversion factor with no explanation for its lateness. On March 2, 1999, NSC submitted preverification changes and raw backup data supporting a corrected conversion factor. NSC stated that its prior "misstatement" that actual weights were unavailable was "based on a factual misunderstanding on the part of the NSC staff responsible for the preparation of NSC's responses in the instant investigation." Because NSC had not timely provided weight conversion data, Commerce informed NSC at verification that it would not accept or verify the conversion factor or supporting data. See Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Japan, 64 Fed.Reg. 24,329, 24,361 (Dep't Commerce May 6, 1999) ("Final Results").
 
 
 7
 In its May 6, 1999 final determination, Commerce reached a number of conclusions, two of which are pertinent to this appeal. First, Commerce used the yen value listed on NSC's invoices as the starting point for determining NSC's U.S. prices, upon the ground that the yen figure was "the value which is invoiced and paid by NSC's customers." Id. at 24,345. Commerce converted this value to dollars at the exchange rate effective on the shipment date. See id. Second, Commerce confirmed its rejection of NSC's conversion factor data and assigned a margin to the affected sales based upon facts available. See id. at 24,360-61. Finding that NSC had failed to act to the best of its ability with respect to the conversion factor data because NSC could have provided it when originally requested, Commerce drew an adverse inference in assigning that margin. See id. at 24,362.
 
 
 8
 Bethlehem and NSC timely filed actions before the Court of International Trade contesting Commerce's final determination pursuant to 19 U.S.C. § 1516a(a)(2). The Court of International Trade remanded the case to Commerce three times before entering final judgment. See Nippon Steel Corp. v. United States, 118 F.Supp.2d 1366, (Ct. Int'l Trade 2000) ("Nippon I"); Nippon Steel Corp. v. United States, 146 F.Supp.2d 835 (Ct. Int'l Trade 2001) ("Nippon II"); Nippon Steel Corp. v. United States, No. 01-122 (Ct. Int'l Trade Oct. 12, 2001) ("Nippon III"); Nippon Steel Corp. v. United States, No. 01-152 (Ct. Int'l Trade Dec. 27, 2001) ("Nippon IV"). In Nippon I, the court vacated Commerce's decision to use adverse facts available against NSC and remanded the matter to determine whether the failure to timely produce the conversion factor data was "an excusable inadvertence on NSC's part or a demonstration of a lack of due regard for its responsibilities in the investigation." 118 F.Supp.2d at 1378-79. The court also affirmed Commerce's use of the invoiced yen price as the starting price in its export price calculations. Id. at 1380-81. In Nippon II, the court held that Commerce's decision to apply adverse facts available on remand was not supported by substantial evidence because Commerce failed to "cite factors beyond NSC's failure to respond correctly to the agency's two requests for the weight conversion factor." 146 F.Supp.2d at 838. The court also held that 19 C.F.R. § 351.104(a) was not in accordance with law to the extent that it prohibited Commerce from considering the untimely conversion factor data when evaluating the impact on NSC's dumping margins. Id. at 843-44. That regulation precludes the inclusion of material returned to a submitter in the official record of proceedings. The case was remanded for Commerce to determine the dumping margin without using adverse facts available. Id. at 845. In Nippon III, the court again remanded, holding that Commerce's calculations using neutral facts available resulted in an implausible conversion factor. Nippon III, slip op. at 11. Finally, in Nippon IV, the court found that "Commerce has not meaningfully changed its methodology as ordered." Nippon IV, slip op. at 4. Instead of remanding a fourth time, the court "refuse[d] to further extend litigation by reopening the issue" and ordered Commerce to use NSC's suggested weight conversion factor. Id. at 6.
 
 
 9
 Bethlehem and the government separately appeal to this court. Both appellants argue that the Court of International Trade erred by rejecting Commerce's original determination to apply partial adverse facts available because Commerce's determination was supported by substantial evidence. Both appellants also argue that the court erred in its conclusion that 19 C.F.R. § 351.104 is invalid because Commerce's interpretation of that regulation is in accordance with law and entitled to deference. Bethlehem separately argues that the court erred by holding that Commerce's determination of the "starting price" to be used for NSC's U.S. sales was supported by substantial evidence.
 
 
 10
 This court has jurisdiction under 28 U.S.C. § 1295(a)(5).
 
 DISCUSSION
 A. Standard Of Review
 
 11
 We review a decision of the Court of International Trade evaluating an antidumping determination by Commerce by reapplying the statutory standard of review that the Court of International Trade applied in reviewing the administrative record. Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed.Cir.2002) cert. denied, ___ U.S. ___, 123 S.Ct. 2073, 155 L.Ed.2d 1059 (2003) (No. 02-1141). Commerce's special expertise in administering the anti-dumping law entitles its decisions to deference from the courts. See, e.g., Micron Tech., Inc. v. United States, 117 F.3d 1386, 1394 (Fed. Cir.1997); Torrington Co. v. United States, 68 F.3d 1347, 1350-51 (Fed.Cir. 1995); see also Chevron USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000); Micron Tech., 117 F.3d at 1393. "Substantial evidence" has been defined as "more than a mere scintilla," as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that "fairly detracts from the substantiality of the evidence." Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir.1984).
 
 B. Imposition of Adverse Inference
 
 12
 The first issue before us is whether Commerce's initial decision to apply an adverse inference in selecting facts available was supported by substantial evidence. Appellants argue that Commerce acted within its discretion because NSC had the ability to provide the conversion factor data requested in a timely manner and simply failed to comply. Appellants contend that under the circumstances of this case, 19 U.S.C. § 1677e allows Commerce to apply an adverse inference against respondents who fail to act to the best of their ability in complying with department requests. To the extent that the Court of International Trade required Commerce to show that the failure to provide information was not "inadvertence" or "a simple mistake," appellants complain that the court injected an element of intent not found in the statute.
 
 
 13
 NSC argues that the Court of International Trade properly rejected Commerce's interpretation of section 1677e. Specifically, NSC supports the court's conclusion and contends that the inquiry into whether a respondent has acted to the best of its ability requires a determination whether the respondent showed a "lack of due regard for its responsibilities in the investigation." See Nippon I, 188 F.Supp.2d at 1379. NSC argues that Commerce's interpretation of the statute amounts to a requirement that responses to inquiries be perfectly compliant and that "punishing" respondents for inadvertent errors serves no legitimate purpose under the antidumping laws.
 
 
 14
 The parties frame the issue in this case as a dispute over the scope of the "best of its ability" standard in section 1677e. When evaluating an interpretation of a statutory scheme that an agency is charged to administer, we apply the familiar two-part inquiry to determine whether to sustain an agency's interpretation of that statute. See Chevron, 467 U.S. at 842-44, 104 S.Ct. 2778. First, the court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778.
 
 
 15
 Turning to the words themselves, section 1677e provides:
 
 
 16
 If —
 
 
 17
 (a) In general
 
 
 18
 * * *
 
 
 19
 (2) an interested party or any other person —
 
 
 20
 (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
 
 
 21
 * * *
 
 
 22
 the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.
 
 
 23
 (b) Adverse inferences
 
 
 24
 If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.
 
 
 25
 19 U.S.C. § 1677e (2000). The statute has two distinct parts respectively addressing two distinct circumstances under which Commerce has received less than the full and complete facts needed to make a determination. Under subsection (a), if a respondent "fails to provide [requested] information by the deadlines for submission," Commerce shall fill in the gaps with "facts otherwise available." The focus of subsection (a) is respondent's failure to provide information. The reason for the failure is of no moment. The mere failure of a respondent to furnish requested information — for any reason — requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination. As a separate matter, subsection (b) permits Commerce to "use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available," only if Commerce makes the separate determination that the respondent "has failed to cooperate by not acting to the best of its ability to comply." The focus of subsection (b) is respondent's failure to cooperate to the best of its ability, not its failure to provide requested information.
 
 
 26
 The legislative history found in the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), confirms the distinction between the two sections. Prior to the adoption of the URAA, the Tariff Act mandated the use of the "best information available" if a respondent refused or was unable to produce information in a timely manner or in the form requested by Commerce. In adopting the URAA, Congress changed the terminology and noted:
 
 
 27
 New section [1677e(a)] requires Commerce and the Commission to make determinations on the basis of facts available where the requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information.
 
 
 28
 * * *
 
 
 29
 [N]ew section [1677e(b)] permits Commerce and the Commission to draw an adverse inference where a party has not cooperated in a proceeding. A party is uncooperative if it has not acted to the best of its ability to comply with requests for necessary information. Where a party has not cooperated, Commerce and the Commission may employ adverse inferences about the information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.
 
 
 30
 SAA at 869-70, reprinted in 1994 U.S.C.C.A.N. 4040, 4198-99. Thus, the legislative history mirrors the language in the statute by recognizing that: (1) Commerce must use facts otherwise available when requested information is missing and (2) Commerce may impose an adverse inference after determining that a respondent has not been fully cooperative or has failed to act to the best of its ability in gathering information.
 
 
 31
 The statute does not provide an express definition of "the best of its ability." None of the parties argue that the language is ambiguous. Rather, they each dispute the plain meaning of the phrase. Appellants argue that the statute requires Commerce to determine (1) "the best of [the respondent's] ability" and (2) whether the respondent has met that standard. NSC criticizes that test, claiming that it amounts to a "perfection standard." We disagree. The ordinary meaning of "best" means "one's maximum effort," as in "do your best." Webster's New Collegiate Dictionary 104 (1981). "Ability" refers to "the quality or state of being able," especially "physical, mental, or legal power to perform." Id. at 2. Thus, the statutory mandate that a respondent act to "the best of its ability" requires the respondent to do the maximum it is able to do.
 
 
 32
 Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping. It assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.
 
 
 33
 The Court of International Trade concluded that "[t]he fact that NSC did not make appropriately timely submissions as a result of inadequate inquiries ... only provides sufficient basis for the use of facts available pursuant to 19 U.S.C. § 1677e(a)(2)(B)." Nippon II, 146 F.Supp.2d at 839. We disagree with that interpretation because it is predicated on an unduly stringent interpretation of 1677e(b) and, thus, fails to appreciate the proofs needed to trigger an adverse inference. To conclude that an importer has not cooperated to the best of its ability and to draw an adverse inference under section 1677e(b), Commerce need only make two showings. First, it must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. See Ta Chen, 298 F.3d at 1336 (holding that Commerce reasonably expected importer to preserve records of accused antidumping activity). Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records. An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown. While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element. "Inadequate inquiries" may suffice. The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent.
 
 
 34
 The Court of International Trade's requirement that Commerce show that NSC made more than "a simple mistake" or exercised a "lack of due regard for its responsibilities in the investigation" is likewise not supported by the statute. NSC suggests that under the facts of this case, Commerce should have evaluated NSC's overall pattern of behavior, examined the reasons for the initial mistake and subsequent correction, considered the "inordinate pressures placed on NSC by Commerce's accelerated investigation schedule," and permitted NSC to explain the extenuating circumstances related to its initial response. Commerce certainly could have done that; however, section 1677e(b) does not by its terms set a "willfulness" or "reasonable respondent" standard, nor does it require findings of motivation or intent. Simply put, there is no mens rea component to the section 1677e(b) inquiry. Rather, the statute requires a factual assessment of the extent to which a respondent keeps and maintains reasonable records and the degree to which the respondent cooperates in investigating those records and in providing Commerce with the requested information. In preparing a response to an inquiry from Commerce, it is presumed that respondents are familiar with their own records. It is not an excuse that the employee assigned to prepare a response does not know what files exist, or where they are kept, or did not think—through inadvertence, neglect, or otherwise to look beyond the files immediately available.
 
 
 35
 In this case, it is undisputed that NSC triggered section 1677e(a) by failing to timely provide the conversion factor data to Commerce. The issue is whether NSC triggered section 1677e(b). Under the proper standard, substantial evidence supports Commerce's conclusion that NSC failed to act to the best of its ability in acquiring the conversion factor data. Commerce asked NSC for the data, and NSC responded that the information was not necessary for the investigation. Commerce asked again, and NSC responded that the information did not exist. Commerce concluded that NSC failed to act to the best of its ability and assigned an adverse margin to sales made by NSC upon a theoretical weight. Three days after assigning the adverse margin, NSC produced the information Commerce requested. NSC later explained that it never asked the actual factories for the information, and once it did, it was able to provide that information to Commerce.
 
 
 36
 Following the first remand in this case, Commerce set forth its opinion as to what efforts NSC could have put forth to comply with the "best of its ability standard" and concluded that NSC did not meet that standard in this case.
 
 
 37
 A "reasonable respondent," acting to the "best of its ability" to comply with the Department's request for such [conversion factor data], would minimally have contacted the factory, where the steel coils were produced and where weighing was most likely to take place, to determine whether they were weighed and the weight data maintained. A "reasonable respondent" would have attempted to obtain the data when it was first requested, or at least when it was requested for the second time, rather than telling the Department, without any factual basis to support such a claim, that the respondent did not believe the Department needed the information. With respect to this issue, NSC was not acting as a "reasonable respondent" nor was it acting "to the best of its ability," as required by the statute.
 
 
 38
 Final Results of Redetermination Pursuant to Court Remand at 5 (Dec. 8, 2000). The second step of the test we set forth is subjective. While Commerce framed its response as an objective inquiry, Commerce's opinion of the level of cooperation this "reasonable respondent" provided was clearly a subjective assessment of NSC's abilities. The response refers to NSC's failure to look for the information at the factories and its initial insistence that Commerce did not actually need the requested information. Using different language, Commerce made the two showings required by the statute. First, Commerce showed, and NSC has not disputed, that the requested conversion factor data is the type of information required to be kept. Second, Commerce determined that NSC was able, but failed to fully investigate and obtain the requested information from the records kept by NSC at the factories where the steel was made.
 
 
 39
 Because Commerce properly concluded that NSC failed to act to the best of its ability, Commerce's decision to apply an adverse inference was in accordance with law. 19 U.S.C. § 1677e(b). Commerce properly returned the untimely conversion factor data to NSC. See 19 C.F.R. § 351.302(d)(1) (1999) ("[T]he Secretary will not consider or retain in the official record of the proceeding ... [u]ntimely filed factual information...."). We need not reach the issue of whether, on remand, Commerce was precluded from evaluating the effects of the missing data because of the prohibition of using factual information returned to the respondent under 19 C.F.R. § 351.104. Thus, we vacate as moot the Court of International Trade's holding that 19 C.F.R. § 351.104(a) is not in accordance with law.
 
 
 40
 C. Use of Yen as the Starting Price for U.S. Sales
 
 
 41
 The next issue is whether Commerce's calculation of the "starting price" of NSC's U.S. sales is supported by substantial evidence and otherwise in accordance with law. Unlike the adverse inference issue, Commerce is aligned with NSC rather than Bethlehem on this issue. Bethlehem argues that the correct "starting price" is the gross price stated in U.S. dollars on NSC's sales invoices. Commerce argues, and NSC agrees, that the "starting price" should be calculated by taking the net yen price actually received by NSC and converting it to dollars at the exchange rate effective on the shipment date. We hold that Commerce's methodology was not in accordance with law.
 
 
 42
 The starting price is a component of the export price, which is explicitly defined in 19 U.S.C. § 1677a(a):
 
 
 43
 The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c) of this section.
 
 
 44
 If the starting price is not in U.S. dollars, then Commerce is required to convert the starting price to dollars "using the exchange rate in effect on the date of sale of the subject merchandise...." 19 U.S.C. § 1677b-1(a) (2000). Under the facts of this case, Commerce's methodology conflicts with the plain language of the statute.
 
 
 45
 NSC and its customers agreed to a sales price in U.S. dollars. On the date of sale (the day the merchandise was shipped), the only price agreed to by the buyer and seller was the U.S. dollar price. The U.S. customer then paid NSC an amount of yen equal to the agreed upon U.S. net price based on the exchange rate in effect on the ninth day following shipment. Depending on the direction of exchange rate fluctuations between the shipping date and nine days following that, either the buyer or seller would benefit from the change, but the sales price in U.S. dollars remained constant.
 
 
 46
 The methodology employed by Commerce requires that the agreed U.S. dollar sales price be converted twice. The first conversion used by Commerce is the conversion from the U.S. dollar sales price to yen at the exchange rate effective on the ninth day following shipping. The second conversion is the conversion from yen back to U.S. dollars at the exchange rate effective on the day of shipment. Commerce argues that its methodology is a better reflection of what NSC actually charges for steel. The net yen amount found on the invoices is the amount of money actually received from the customer. We are sympathetic to Commerce's position. As a policy matter, Commerce's interpretation is appealing. However, because the language of the statute is unambiguous, this is not an area where the agency is afforded deference for its interpretation of the statute. The only "price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation" is the U.S. dollar price found on the invoice. Commerce's methodology uses a price determined nine days after the merchandise is first sold. The unambiguous language of the statute does not allow that, and the Court of International Trade erred by affirming Commerce's methodology.
 
 CONCLUSION
 
 47
 Commerce's decision to apply partial adverse facts available upon NSC for its failure to timely submit the weight conversion data is supported by substantial evidence and is otherwise in accordance with law. Commerce's methodology of calculating the starting price is not in accordance with law. To the extent that the Court of International Trade held the opposite on those issues, we reverse. We vacate as moot the Court of International Trade's holding that 19 C.F.R. § 351.104(a) is invalid. The case is remanded for further proceedings not inconsistent with this opinion.
 
 
 48
 
 REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED
 
 
 COSTS
 
 49
 No costs.