# United States Court of Appeals for the Federal Circuit

---

**ZHEJIANG MACHINERY IMPORT & EXPORT CORP.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-2257

---

Appeal from the United States Court of International Trade in No. 1:19-cv-00039-GSK, Judge Gary S. Katzmann.

---

Decided: April 14, 2023

---

ADAMS LEE, Harris Bricken McVay Sliwoski, LLP, Seattle, WA, argued for plaintiff-appellant.

KELLY A. KRYSTYNIAK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM; NIKKI KALBING, JESUS NIEVES SAENZ, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

—————————

Before PROST, REYNA, and HUGHES, *Circuit Judges.*

REYNA, *Circuit Judge.*

Appellant Zhejiang Machinery Import & Export Corp. appeals the judgment of the U.S. Court of International Trade that affirms the U.S. Department of Commerce's final determination in the 2016–2017 administrative review of tapered roller bearings from China. Zhejiang challenges Commerce's decision that Zhejiang did not qualify for a separate antidumping duty rate because it failed to successfully rebut the presumption of de facto control by the government of China. Commerce's determination that Zhejiang was not entitled to a separate rate was reasonable and supported by substantial evidence because a labor union is the majority shareholder with significant rights over Zhejiang and has overlapping membership with the employee stock-ownership committee. Accordingly, we affirm.

I.

In June 2017, the U.S. Department of Commerce ("Commerce") initiated an antidumping duty investigation on certain tapered roller bearings ("TRBs") from the People's Republic of China ("PRC"). *See* 82 Fed. Reg. 26,443 (Dep't of Commerce June 1, 2017); 82 Fed. Reg. 35,749–51 (Dep't of Commerce Aug. 1, 2017). Antidumping duties may be imposed on U.S. imports of goods that have been determined are sold in the United States at less than fair value, i.e., dumped or dumping, and that a domestic industry is "materially injured" or "threatened with material injury," by virtue of the dumped imports. 19 U.S.C. § 1673;

*see, e.g.*, *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1306 (Fed. Cir. 2017).[1]

An antidumping duty investigation may involve a non-market economy ("NME"). A non-market economy country, such as the PRC, is "any country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A); *see, e.g.*, J.A. 526–722.

Investigated goods from a non-market economy country are subject to a single country-wide antidumping duty rate. *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997). An individual producer from that country can seek to receive an individual rate (as opposed to the country-wide rate) if it demonstrates that the NME country's government lacks both de jure and de facto control over its activities. *Id*. at 1405. Only de facto control is at issue in this appeal. Oral Arg. at 4:55–5:04.

To show an absence of de facto government control, the foreign producer can demonstrate that it sets its prices independently, negotiates its own contracts, selects its management autonomously, and keeps its sales proceeds. *Silicon Carbide from the People's Republic of China,* 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994); *see also Sigma Corp.*, 117 F.3d at 1405–06. If the exporter fails to meet its burden in demonstrating the absence of government control, Commerce can decline to issue a separate

---

[1]     Generally, in an antidumping investigation, Commerce determines the extent of dumping, and the U.S. International Trade Commission investigates whether a domestic industry that produces a like product (here, TRBs) under investigation is materially injured or threatened with material injury by virtue of dumped imports. 19 U.S.C. § 1673(2).

company-specific rate and instead apply to that exporter the country-wide antidumping duty rate. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 (Ct. Int'l Trade 2013).

On October 26, 2017, Commerce published a memorandum, "China's Status as a Non-Market Economy" (the "NME Status Memorandum"), which discussed various factors that the agency examines in making its determination on de facto government control, including the Chinese economy as a whole. J.A. 526. A key factor is the legal and institutional framework of trade unions of the Government of China ("GOC"). J.A. 545–548. The NME Status Memorandum explains that Chinese labor laws permit employees to join and organize trade unions and negotiate contracts, but the unions must be approved by the state. J.A. 545. In actuality, labor and management do not "carry out real bargaining" and "management does not even meet with the trade unions, and "just sends them a collective contract for 'approval.'" J.A. 551 (internal citations omitted). In other words, "[f]ormal indicia of trade union membership in China do not necessarily support a conclusion [of] free bargaining." *Id.*

The NME Status Memorandum outlines that the All-China Federation of Trade Unions ("ACTFU") has been China's official trade union since the founding of the PRC in 1949. J.A. 546. The ACTFU has a "legal monopoly on all trade union activities" and the ACTFU is subject to the control of the Chinese Communist Party (the "CCP") such that trade or labor union leaders concurrently hold office at a corresponding rank of the CCP or government. *Id.* Indeed, "[t]rade union officials are officially employees of the Chinese government" and are considered, by Commerce, to be "government actors under CCP control." *Id.* Additionally, State-Owned Assets Supervision and Administration Commission of the State Council ("SASAC") is the managing entity of state-owned assets that has the power to

appoint managers and board members of state-owned enterprises but is influenced by the CCP.  J.A. 608–09.

## II.

In 1987, in the underlying antidumping duty investigation, Commerce established a country-wide anti-dumping duty for TRBs from the PRC.  *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 52 Fed. Reg. 22,667, 22,667 (Dep't of Commerce June 15, 1987).  In 2009, Commerce revised the rate to 92.84%.  *Zhejiang Machinery Import & Export Corp. v. United States*, 471 F. Supp. 3d 1313, 1326 (Ct. Int'l Trade 2020) (*Decision I*) (citing 74 Fed. Reg. 3,987, 3,989 (Dep't of Commerce Jan. 22, 2009)).  Since 2017, Zhejiang Machinery Import & Export Corp. ("ZMC") had previously been granted separate rate status in prior reviews of TRBs from China.  Appellant's Br. 4, 32.  An interested domestic party requested review of ZMC's entries for a period of review of June 1, 2016, to May 31, 2017, and submitted data indicating de facto control of ZMC by the GOC.  *Decision I*, at 1326–27; *see also Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 35,749, 35,749 (Dep't of Commerce Aug. 1, 2017).

At the request of an interested party, Commerce can conduct an administrative review of an outstanding antidumping duty order and, to the extent necessary, recalculate antidumping duties for the period of review.  19 U.S.C. § 1675(a)(1)–(2).  In 2017, Commerce published a notice of opportunity to request review of the 2009 rate ("the 2009 Administrative Review").  ZMC filed an application seeking a separate review.

### CORPORATE STRUCTURE

In its response to a questionnaire issued by Commerce, ZMC provided details about its corporate structure.



Appellant's Br. 6.   According to that data, ZMC (or "Zhejiang Machinery" in the chart above) is wholly owned by Zhejiang Sunny I/E Corporation ("Sunny") which is, in turn, owned in minority part by Zhejiang Province Metal & Minerals Import and Export Co., Ltd. ("Zhejiang MMI&E"). Appellant's Br. 5.  Zhejiang MMI&E is ultimately owned by the Zhejiang Provincial SASAC. *Id*. at 7.  Sunny's majority shareholder, a labor union, was registered in accordance with the Labor Union Law of the PRC and Civil Law of the PRC and is registered before the Zhejiang Federation of Trade Unions, a provincial level branch of the ACTFU. *Id*. at 9–10. ZMC characterized Sunny's labor union as the "nominal owner" of the majority shares because the ultimate owners were the members of Sunny's employee stock ownership company ("ESOC"), which cannot have legal personhood under Chinese law or be assigned shares. *Decision I*, at 1327.

## CIT ACTIONS

In July 2018, Commerce issued its preliminary determination in the 2009 Administrative Review. *Decision I*, at 1326–27.  After assessing ZMC's corporate structure provided in ZMC's separate rate application, Commerce preliminarily found that ZMC failed to rebut the presumption of de facto government control over its export activities. Appellee's Br. 5; *Decision I*, at 1327.   In particular,

Commerce found that Sunny's labor union and the GOC-controlled SASAC together own 100% of Sunny and that Sunny, in turn, owns 100% of ZMC. *Decision I*, at 1327. According to Commerce, all labor unions are under the control and direction of the ACTFU, which is a government affiliated "organ" of the CCP, and therefore, the GOC has actual or potential control over ZMC's export activities. *Id.* at 1327–28.

ZMC submitted its case brief that included a revision of the original translation of the ESOC's Articles of Association, but Commerce rejected consideration of the new translation as untimely, and, instead, it considered ZMC's revised brief without the translation of the ESOC's Articles of Association. *Id.* at 1328.

In February 2019, Commerce published its final determination, which maintained the preliminary results that ZMC failed to rebut the presumption of de facto control. *Decision I*, at 1328–29. Commerce reasoned that Sunny's labor union (the majority shareholder) was ultimately controlled by the ACTFU—an extension of the CCP—and that Zhejiang MMI&E (the minority shareholder) was wholly owned by the Zhejiang SASAC. Appellee's Br. 9. Additionally, the ESOC and labor union are intertwined because all members of the ESOC are labor union members. *Id.* at 10.

ZMC appealed to the Court of International Trade ("CIT"), challenging Commerce's final determination, including the refusal to consider the revised translation of the ESOC Articles. *Decision I*, at 1329. The CIT held that Commerce erred in rejecting the revised translation of Sunny's Articles and remanded the case, directing Commerce to consider the translation and explain how Sunny's labor union had the potential to exercise majority shareholder rights in light of the presence of the ESOC. Appellee's Br. at 11–12; *Decision I*, at 1330.

On remand, Commerce reviewed the revised translation but maintained its determination that ZMC failed to

rebut the presumption of de facto government control for several reasons.  First, Commerce pointed to Article 20 of the ESOC Articles of Association, which states that "[t]he labor union members of [Sunny] may become members of the ESOC after approval of the ESOC, and may purchase and hold shares of the company according to their positions or achievements in the company."  Appellee's Br. 12.  Second, Commerce observed that ZMC's separate rate questionnaire response states that members of the ESOC are also members of the labor union:

> Sunny is majoritively (*sic*) *owned by its labor union*, which consists of [] private individuals.  In Exhibit 1, please see the Articles of Association of Sunny *and the list of labor union members who own the shares of Sunny*.  Based upon the Articles of Association, the majority shareholder, i.e., *Sunny's labor union*, takes majority members of the board of directors and majority voting rights over all important decisions of Sunny within the board of directors.  The board of directors, which is controlled by *the majority shareholder*, also appointed the general manager who is in return responsible for all daily activities of Sunny.

*Id*. at 13 (citing J.A. 803) (emphases in original).  Third, Commerce did not distinguish labor union membership from leadership, noting that the GOC "has the ability to control labor union members to the same extent as labor union leaders" and that collectively, these individuals, who are members of the labor union, direct the equity ownership of Sunny through the ESOC by selecting management and the directors.  *Id*. at 9, 13–15, 48–49 (citing J.A. 782, 804–05).

ZMC challenged Commerce's determination, asserting that Commerce had changed its position to rely entirely on the premise that the CCP controlled Sunny because some owners of Sunny were also members of the labor union.  *Zhejiang Machinery Import & Export Corp. v. United*

*States*, 521 F. Supp. 3d 1345, 1350 (Ct. Int'l Trade 2021) (*Decision II*).  The CIT reviewed Commerce's remand determination and affirmed Commerce's determination that ZMC had failed to rebut the presumption of government de facto control.  *Id*. at 1351.  ZMC appealed.  We have jurisdiction under 28 U.S.C. § 1295(a)(5).

DISCUSSION

We review a judgment of the Court of International Trade de novo, reapplying the same standard of review applied by that court in its review of Commerce's antidumping duty determinations.  *See NEXTEEL Co. v. United States*, 28 F.4th 1226, 1233 (Fed. Cir. 2022).  As such, we review Commerce's findings for substantial evidence.  *Id*.  Substantial evidence is "evidence that a reasonable mind might accept as adequate to support a conclusion."  *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 840 (Fed. Cir. 2020) (citation omitted); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003).

On appeal, ZMC contends that the corporate structure here differs from other cases where Commerce has denied separate rate status to an exporter that was either directly or indirectly owned by a company with majority shareholding held by a SASAC entity.  Appellant's Br. 19.  ZMC asserts that the SASAC entity in this case only held an "indirect *minority* shareholding."  *Id*. (emphasis in original).  The record evidence, ZMC believes, shows that the union could not exercise any control—actual or potential—over the corporation because the union could not make capital contributions and, consequently, had no voting rights.  Oral Arg. at 3:43–4:03.  ZMC argues that Commerce should have focused on the majority of the corporation's shares being held by the twenty individual employees who formed the ESOC because they had true voting rights while the labor union's possession of those shares were nominal.  Appellant's Br. 20; Oral Arg. at 3:56–4:11.  ZMC claims that mere passive membership of the ESOC in a labor union

10          ZHEJIANG MACHINERY IMPORT & EXPORT CORP. v. US

where they participate only in non-union activities is not enough to establish the GOC's control. Appellant's Br. 20.

The government argues that the NME Status Memorandum explains how the Chinese union structure shows government involvement and is evidence of a "top-down, state-led approach to collective bargaining in China [that] essentially produces government-managed outcomes." Appellee's Br. 26–27 (citing J.A. 551). While ZMC's questionnaire response and case brief assert that the union is a nominal majority shareholder, the government contends that the Articles of Association do not limit the labor union's power—let alone "carve out any rights for the ESOC." *Id.* at 37–38. The government explains that the union can still appoint board members who control operations and price setting, can still vote on shareholder resolutions, and can still determine the disposition of profits. *Id.* at 39. Additionally, the government asserts that Zhejiang MMI&E, the state-owned minority owner of ZMC, has significant control over Sunny because it can elect two out of five board members. *Id.* at 39–40. So, not only are Sunny's employees members of the union, but the union itself is the majority shareholder. *Id.* at 41. Therefore, the government argues, the GOC could exert influence over Sunny and ZMC if it wanted to. *Id.*

As the CIT has noted, "[w]here a majority shareholder has potential control[,] that control is, for all intents and purposes, actual control." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2018). The mere presence of a government-owned *minority* shareholder may not be sufficient to establish de facto government control. *Id.* at 1359, 61–62. But where evidence of additional indicia of control shows that the minority shareholder could exercise its right to control—such as Articles of Association without restrictions on the minority shareholder's rights, or evidence that the minority shareholder stifled other shareholders' opportunity to put competing nominations to the board or indirectly

appointed board members—a determination of de facto government control is reasonable. *Id*. at 1361–64.

There is no dispute that the labor union is the legal majority shareholder of ZMC. Oral Arg. at 8:42–8:48. The record demonstrates that the labor union is a majority shareholder of and has influence over Sunny, which owns 100% of ZMC. Corporate documents show that the labor union is the majority shareholder; the union voted to appoint the corporation's general manager and board members; one of the twenty ESOC members is both a union member and a union official; and the remaining ESOC members are also union members. J.A. 785; Appellee's Br. 13, 24; Oral Arg. at 18:29–35. Commerce's NME Status Memorandum explains that (1) workers in China have "limited collective bargaining power because they lack the freedom to associate and assemble and the right to strike," J.A. 551, and (2) all labor unions are ultimately under the control of the ACTFU and—by extension—the CCP, J.A. 785. Even if ZMC were correct that the ESOC exercises majority shareholder rights, the common membership of the ESOC members with the labor union (and one union official) shows that the GOC has the potential to exercise control over the ESOC through its labor union members and, consequently, over Sunny and ZMC. J.A. 805–06; Oral Arg. at 15:49–16:34, 17:17. Even ZMC's minority shareholder, which is owned by a SASAC entity, has the power to appoint two board members, thereby having *at least* the potential to control ZMC—if not actual control over the corporation.

ZMC's corporate documents do not support its argument that the labor union *cannot* exercise any voting rights as the legal majority shareholder. Article 11 of Sunny's Articles of Association lists "Zhejiang Province Metals and Minerals Import and Export Co., Ltd." as Shareholder A and "Labor Union of Zhejiang Sunny I/E Co., Ltd." as Shareholder B. J.A. 149. Article 12(1) gives the shareholders the right to participate in meetings and "exercise voting

rights . . . in proportion to their capital contribution." *Id.* at 149. While ZMC argues that this proportionality of rights hinges on capital contributions, and the union cannot legally make any capital contributions, ZMC has not shown whether all shareholder rights are tethered to capital contributions. For example, Article 12(3) gives "shareholders of the Company" the right to "elect and be elected as director or supervisor of the Company," and Article 12(5) permits shareholders to "exercise the priority purchase right." *Id.* Article 14 provides that the "board of shareholders of the Company shall be composed by both of its shareholders" as the "organ of authority of the Company." *Id.* Article 21 explains that the Board is accountable to the shareholders (including the labor union) and "shall" "decide on business plans and investment plans," formulate the annual budget, formulate the "profit distribution plans and plans for making up losses," and decide on the "internal management organization." *Id.* at 150; *see* Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Factual Information Regarding Zhejiang Machinery (Oct. 2, 2017), P.R. 109 ("ZMC October Submission"); Appellee's Br. 10. Article 27 provides that the company "shall have a board of supervisors, which shall have three members," and that board is to be "appointed by the board of shareholders." J.A. 151. These shareholder rights do not appear to be expressly tied to a shareholder's capital contributions from the Articles.

The record does *not* disclose an instance where Sunny was unable to exercise its rights as a majority shareholder due to GOC influence through the labor union. Appellant's Br. 22, 36–37; Appellee's Br. 16–17; Arg. at 15:25–50. The absence of such evidence, however, does not necessarily negate the potential for GOC control, particularly as the burden lies with ZMC to develop a full record and affirmatively rebut the presumption. *Sigma,* 117 F.3d at 1405–06; *see also Decision II*, at 1351–52.

Commerce found that Sunny's labor union had the inherent ability to appoint board members who "in turn control Zhejiang Machinery, including company operations and price setting," vote on shareholder resolutions, and "determine the disposition of profits." Appellee's Br. 10 (citing J.A. 783); ZMC October Submission. Sunny's "Resolution of Shareholders' Meeting" suggests that shareholders approve board appointments. Appellee's Br. 6. Board meeting minutes also suggest that only the board elected by the labor union voted on matters. Appellee's Br. 48. Article 20 of the ESOC's Articles of Association states that the labor union members can purchase shares of the company. Appellee's Br. 12. And yet, neither Sunny's Articles of Association nor its board meeting minutes mention the employees or "ESOC." J.A. 148–53; Appellee's Br. 37–38. Accordingly, ZMC's argument that the corporation is actually governed by the ESOC is unreasonable and unsupported by substantial evidence. *Contra* Appellant's Br. 50–51.

Commerce has previously found an exporter's labor union membership relevant to the de facto analysis. *See* Appellee's Br. 42 n. 3 (citing *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 84 Fed. Reg. 38,002 (Dep't of Commerce Aug. 5, 2019), and accompanying IDM at 50 ("Thus, we continue to conclude that [the company's] government-owned entity, the Labor Union, which is under control of the ACTFU, exercises, or has the potential to exercise, control over [the company's] export operations.")). When "Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation" as to why it departs from it. *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004). Thus, Commerce's consideration of the labor union's role in ZMC's corporate structure was not error.

14    ZHEJIANG MACHINERY IMPORT & EXPORT CORP. v. US

Together, ZMC's submissions demonstrate that the shareholders, including the labor union, have the power to select managers and keep the profit distribution—factors that Commerce has considered in establishing the presumption of de facto control. *See, e.g.*, *Sigma*, 117 F.3d at 1405–06 (considering independent pricing, contract negotiation, management selection, and profit management). Given the legal framework of unions in China, there is no absence of control over ZMC from the labor union or ACTFU because the ESOC cannot negotiate its own contracts or organize as a legal person, nor is there any measurement by the GOC to decentralize control of unions or the union in this case as majority shareholder. Even if this is the first case where an exporter is arguing that the voting shareholder is an employee stock ownership committee, Commerce's determination of de facto government control, based on ZMC's corporate structure comprising union membership and overlapping ownership with a union official, paired with an absence of support for ZMC's argument of restricted GOC control over the ESOC, is reasonable and supported by substantial evidence. The CIT properly affirmed Commerce's remand determination denying ZMC a separate rate due to de facto government control.

## CONCLUSION

We hold that Commerce's determination of the presumption of de facto government control over ZMC was supported by substantial evidence and otherwise not contrary to law. We therefore affirm the CIT's decision sustaining Commerce's final results of redetermination pursuant to court remand that denied ZMC a separate antidumping rate. We have considered ZMC's remaining arguments and find them unpersuasive.

## AFFIRMED

### COSTS

No costs.