**Slip Op. 24-23**

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

**Court No. 20-00105**

CATFISH FARMERS OF AMERICA, *et al.*,

*Plaintiffs*,

v.

UNITED STATES,

*Defendant*,

and

NTSF SEAFOODS JOINT STOCK COMPANY,

*Defendant-Intervenor.*

Before: M. Miller Baker, Judge

## OPINION

[The court partially sustains Commerce's redetermination and remands for further proceedings.]

Dated: February 26, 2024

*Nazak Nikakhtar*, *Maureen E. Thorson*, and *Stephanie M. Bell*, Wiley Rein LLP of Washington, DC, on the comments for Plaintiffs.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; and *Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of

Justice of Washington, DC, on the comments for Defendant. Of counsel on the comments was *Hendricks Valenzuela*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

*Robert G. Gosselink* and *Jonathan M. Freed*, Trade Pacific PLLC of Washington, DC, on the comments for Defendant-Intervenor.

*Baker*, Judge: This case returns after the court directed the Department of Commerce to reconsider (1) whether Indonesia is economically comparable to Vietnam; (2) the finding that Indian data are superior to Indonesia's; (3) certain evidence submitted by Plaintiffs Catfish Farmers of America and its individual members, and in light of that evidence, whether Defendant-Intervenor NTSF Seafoods Joint Stock Company accurately reported production information; (4) NTSF's byproduct offset; and (5) evidence relating to moisture content. ECF 68, at 1–2.[1]

On remand, Commerce largely stood its ground. Appx017420–017421. Catfish Farmers challenge those results. ECF 86, at 8. The government responded, *see* ECF 84, and NTSF joined in those comments, *see* ECF 83. The court requested supplemental briefing, ECF 96, which the parties submitted, ECF 99

---

[1] The court presumes the reader's familiarity with its previous opinion, *NTSF Seafoods Joint Stock Co. v. United States*, Ct. Nos. 20-00104 and 20-00105, Slip Op. 22-38, 2022 WL 1375140 (CIT Apr. 25, 2022).

(plaintiffs), ECF 100 (government). The court again remands.

## I

Catfish Farmers brought this suit under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii) to contest Commerce's final determination in the 15th administrative review of the applicable antidumping order. Subject-matter jurisdiction is conferred by 28 U.S.C. § 1581(c).

In actions brought under 19 U.S.C. § 1516a(a)(2), "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

II

Broadly speaking, the issues presented fall into two buckets: the selection of a primary surrogate country and how NTSF reported factors of production. The court addresses them in turn.

A

1

In determining costs of production in antidumping cases involving goods imported from a nonmarket-economy country, Commerce must use, "to the extent possible," one or more market-economy countries (surrogates) that are "at a level of economic development *comparable to* that of the nonmarket economy country." 19 U.S.C. § 1677b(c)(4) (emphasis added). The court accordingly instructed the agency to "explain whether Indonesia is economically comparable to Vietnam using the same World Bank gross national income data used to identify India and the five other countries on the Department's list of six countries at levels of comparable economic development." ECF 68, at 1 (remand order).

Notwithstanding the court's instruction, Commerce found Indonesia presumptively ineligible because it was not at the "same" level of economic development as Vietnam:

[D]espite the petitioners' arguments that Indonesia represents a country at a comparable level of economic development as Vietnam, it was not at the *same* level of economic development and,

thus, did not present a scenario where Commerce must afford that country the same consideration as others on the list of countries at the same level of economic development.

Appx017428 (emphasis in original; internal quotation marks and brackets omitted).

The statute, however, does not require a surrogate to be at the "same" level of economic development as the nonmarket-economy country where imports are produced. Instead, it only dictates that a surrogate have a "comparable" level of development, 19 U.S.C. § 1677b(c)(4), a somewhat broader standard, as it includes the merely similar as well as the identical.

Indeed, the remand results themselves show that Commerce views "the same" as narrower and more selective than "comparable":

> Surrogate [candidates] that are not at the same level of economic development as the [nonmarket-economy] country, but still at a level of economic development *comparable* to the [nonmarket-economy] country, are selected only to the extent that data considerations outweigh level-of-economic development differences or significant producer considerations.

Appx017423 (emphasis added).

Commerce thus presumptively disqualifies countries that are only "comparable" in favor of its own stricter criterion. But the statute requires the use of "one or more market economy countries that are . . . at

a level of economic development *comparable* to that of the nonmarket economy country." 19 U.S.C. § 1677b(c)(4)(A) (emphasis added). A more demanding rule that excludes "comparable" countries is therefore not in accordance with law. The court remands again for the Department to apply the statutory standard—under protest, if necessary.

2

a

The court concluded that Commerce impermissibly used circular reasoning to find that "the Indian data were superior in part because 'the Indonesian information is not from the primary surrogate country which we have selected in this case, India.'" Slip Op. 22-38, at 41, 2022 WL 1375140, at *14. On remand, the Department objects that "[t]his passage was not intended to suggest any inherent superiority of the Indian data; rather, it reflects the standard application of Commerce's sequential surrogate country selection process." Appx017430.

The problem—as explained above—is that the Department went off the rails in its sequential selection process when it excluded Indonesia from consideration as a surrogate because that country was only at a comparable (rather than the same) level of economic development. On remand, insofar as Commerce includes Indonesia on its candidate list because it is at a comparable level, the Department must evaluate the Indian data on its relative merits vis-à-vis Indonesian data. *See* Import Administration Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process*

(Mar. 1, 2004), at 4 ("[I]f more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country."), ECF 73-2.

b

i

The court directed Commerce to explain its use of the *Fishing Chimes* study because it was unclear whether that study represented a "broad market average." Slip Op. 22-38, at 41–45, 2022 WL 1375140, at **14–15. The court observed that *Fishing Chimes* appeared to say that most of Andhra Pradesh's[2] fish producers were not located in the districts on which the study focused. *See id.* at 43–44, 2022 WL 1375140, at *15 ("[H]ow can a study that relies on data from only those two districts represent a broad market average, absent data (which no party has cited) showing that those districts produced far more fish than anywhere else?").

Commerce responded by block-quoting a paragraph from *Fishing Chimes* that, first, estimates that pangasius is being farmed "in more than 300 villages in West Godavari and Krishna districts"; second, states that the survey focused on those areas "as they are major producers"; and, third, clarified that "[o]ut of the 300 villages that the study covered, 46 of them are in these two districts." *Id.* (quoting Appx13786). The Department concluded that "the study selected 54

---

[2] Andhra Pradesh is an Indian state.

farmers from 46 villages, and the researchers explicitly considered the representativeness of the data in selecting their survey sample." Appx017435.

The quoted passage from *Fishing Chimes* does not support Commerce's conclusion. While the study refers to pangasius farming in "more than 300 villages" in the two districts in question, it also says that only 46 of the 300 villages studied were located *in those districts*. By negative implication, that means the other 254 studied villages were *not* so located. This is the same problem the court identified when it first remanded, and the Department's explanation fails to engage with it. The court again remands.[3]

ii

The court instructed the Department to reconsider its reliance on *Fishing Chimes* data as to fish feed. *Id.* at 46–47, 2022 WL 1375140, at **15–16. Commerce accordingly cited an article from a source called *Undercurrent* as substantiating that data. Appx017467. As Catfish Farmers do not dispute that finding, the court—putting aside its other concerns with *Fishing Chimes*—sustains the agency's reliance on that study's fish feed data.

---

[3] Commerce also found that the *Fishing Chimes* data as to fingerlings represent a "broad market average" based on "the reasons discussed above concerning the reliability of [that] data in general." Appx017436. The court therefore remands the fingerlings finding because it assumes that the study represents a "broad market average"—a finding the court again remands for the reasons explained above.

iii

The court originally remanded Commerce's use of *Fishing Chimes* as to the "whole live fish" input because the agency's entire finding was that "the Indian data for this input are in fact a broad market average, for the reasons discussed above." Slip Op. 22-38, at 47, 2022 WL 1375140, at \*16. The court understood the finding as a reference to the Department's general discussion of whether *Fishing Chimes* overall represented a broad market average. *Id.*

Insofar as the court can discern, the remand results do not address this issue. The Department did state that the prices cited in *Fishing Chimes* were based on around 28 million kg of fish in 2017–18 and 14 million kg during the period of review, which is "a significant volume of fish." Appx017465. Even so, it does not indicate anything as to a "broad market average" absent any discussion showing how those amounts compare to India's overall pangasius production, so the court must remand again.

c

The court remanded Commerce's valuation of labor inputs because the Department used 2006 Indian labor data despite Policy Bulletin 04.1 attaching significance to whether data are "contemporaneous" with the period of review. Slip Op. 22-38, at 48–49, 2022 WL 1375140, at \*16. The court noted that the only argument the government made to support the decision was "its irrelevant contention that Commerce chose the Indian data because India was the primary surrogate country." *Id.*

The Department responded that "the fact that the data are from India *is* relevant" because that country was the primary surrogate based on the "sequential" process. Appx017438–017439 (emphasis in original). To repeat: Commerce's choice of India as the primary surrogate was contrary to law because the Department improperly excluded Indonesia from consideration.

And even if, on remand, Commerce lawfully concludes that Indonesia is not at a "comparable" level of economic development and therefore chooses India as the primary surrogate, it must address how it is reasonable to use Indian data from eleven years before the period of review when Policy Bulletin 04.1 requires the use of contemporaneous data when possible.

B

The second principal issue involves Catfish Farmers' challenge to NTSF's reporting of its factors of production. On remand, Commerce stood by its prior conclusions. *See* Appx017440–017442 (whole live fish ratio and byproducts); Appx017442–017446 (moisture content).

1

The court remanded the whole live fish issue because Catfish Farmers cited three reports in the record showing that around 3.2 kg of whole fish is required to yield 1 kg of product, but the court could "find no indication that Commerce engaged with the reports [they] offered." Slip Op. 22-38, at 62–64, 2022 WL 1375140, at \*\*21–22. The remand order instructed the Department to address those reports and Catfish Farmers'

argument of possible double counting of byproducts. *Id.* at 65 n.23, 2022 WL 1375140, at *22 n.23.

The Department responded that NTSF's whole live fish figures are within the ranges seen in verification reports from yield tests Commerce performed during prior administrative reviews that are part of the record here. Appx017441. It also observed that "*none* of the companies verified in these earlier segments, or NTSF in this segment, had a whole fish to fillet ratio as high as the ratios proposed by" Catfish Farmers. *Id.* (emphasis in original). The agency found Catfish Farmers' reports unpersuasive because it did not either take part in or observe the creation of those studies. Appx017441–017442.

That Commerce did not participate in or observe the preparation of record evidence does not excuse its failure to address that material on its own merits. The court therefore remands again for the Department to explain why the studies proffered by Catfish Farmers are unconvincing or unreliable.

The other aspect of the "whole live fish" issue that the court remanded involved possible double counting. *See* Slip Op. 22-38, at 65 n.23, 2022 WL 1375140, at *22 n.23. Catfish Farmers now ask the court to remand again because the redetermination was "not consistent with the record." ECF 99, at 9. For its part, the government requests a voluntary remand to allow Commerce "to re-evaluate whether potential double counting with NTSF's factors of production reporting is present." ECF 100, at 5. The court will do so.

2

The last issue is Catfish Farmers' contention that NTSF overstated the amount of water and understated the volume of fish in its products. As to this dispute, the Department "failed to address both the record evidence contrary to its decision and the record evidence potentially supportive of its decision." Slip Op. 22-38, at 69, 2022 WL 1375140, at \*23. The court directed Commerce to address NTSF's product labels and "studies and other documentation in the administrative record." *Id.* at 66, 2022 WL 1375140, at \*22.

On remand, the Department stated that NTSF's evidence included third-party inspection certificates relating to moisture content. It found that they "establish that NTSF's reported moisture did not exceed the stated maximum in the contract," Appx017443, and that the test reports showed moisture levels within one percent of those the company reported, *id.*

Commerce then addressed Catfish Farmers' evidence. The Department found that the product labels did not undermine NTSF's reporting because the customer—not the company—specifies what information is printed on the label and nothing in the record shows how the customer determines what is to appear. Appx017444. Catfish Farmers object, arguing that the logic Commerce applied to the inspection reports—that they "came from an independent third party" hired by NTSF's unaffiliated customers "and nothing on the record undermines the reliability of the party or the results obtained by its testing"—applies to the labels as well. ECF 86, at 46.

Commerce reasonably addressed the potential inconsistency. It found that while the inspection reports come from an independent facility that specializes in such testing, nothing in the record ties the customer labels to any testing protocols or shows that NTSF controls the labels' contents. Appx017477.[4] The Department explained that the company and its customers rely on the independent testing, not the product labels, to confirm moisture content. *Id.* Thus, Commerce's choice to rely on NTSF's moisture content reporting is supported by substantial evidence.[5]

---

[4] The agency gave an example of two different calculations that could both show a 30 percent solution of water. Appx017477–017478. "Accordingly, what is reflected in the label depends on how the customer defines 'contains,' and the accuracy of the information therein." Appx017478. Because the Department did not have "definitive evidence" showing how the customers calculated the percentage and what the labels meant by "contains," it could not rely on the labels. *Id.* In contrast, the inspection certificates showed that the moisture content was under the maximum threshold and included actual results of testing consistent with the company's reporting. Appx017478–017479.

[5] The Department also found that other studies and documentation on the record were not necessarily reliable because they may have been prepared using "different procedures and merchandise than those in this review." Appx017445. Catfish Farmers do not challenge that finding.

\* \* \*

For the foregoing reasons, the court sustains the re-determination in part and otherwise remands for further proceedings.

Dated:   February 26, 2024          /s/ *M. Miller Baker*
            New York, NY               Judge